## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| REBECCA ARCHILA, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>KIDS2, LLC, f/k/a KIDS2, INC.,<br><br>Defendant. | Case No.: _____<br><br>**COMPLAINT- CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Rebecca Archila ("Plaintiff"), by and through undersigned counsel, and on behalf of herself and all others similarly situated, alleges as follows against Defendant Kids2, LLC, f/k/a Kids2, Inc. ("Defendant" or "Kids2"), based upon personal knowledge as to herself and her own acts and experiences, and as to all other matters, upon information and belief, including investigation of counsel:

## I.    NATURE OF THE ACTION

1.      This case seeks to put an end to Defendant's improper sales and marketing of baby bassinets, which are unreasonably dangerous and pose a heightened risk of suffocation—all of which is undisclosed at the point of sale.

2.      At issue are Ingenuity-branded baby bassinets, specifically the Ingenuity Dream & Grow Bedside Bassinet, the Ingenuity Dream Hero Starlight 3-in-1 Co-Sleeping Bassinet, and all models and variations within these product lines (collectively, the "Products").

1

3.      Baby bassinets are intended to be secure and confined spaces in which babies can safely sleep.  Critical to safe sleeping is a level surface.  If a bassinet does not maintain a level surface with normal use, babies can end up in dangerous and deadly positions.

4.      The Products employ a "cantilevered" design, meaning they are supported on only one side.  A cantilever is a rigid structural element that extends horizontally and is supported at only one end, which has been recognized by the child products industry, including the Consumer Products Safety Commission ("CPSC"), as problematic and dangerous.[1] According to accounts from numerous online reviews and complaints to the CPSC, the Products lack stability, which can cause babies to roll into the sides of the bassinets, or even onto their stomachs, posing an unreasonable risk of suffocation.

5.      All Products suffer from this uniform defect, which, unknown to consumers but known to Defendant, exists at the point of purchase and poses an unreasonable safety hazard to infants.

6.      The CPSC is aware of at least five infant deaths related to cantilevered bassinets since 2019. Four were cited in a 2021 letter from the agency to the chair of

---

[1] CPSC Staff Letter to ASTM Subcommittee Chair for Bassinets, CPSC.gov (December 7, 2021), available at https://www.cpsc.gov/s3fs-public/BassinetwcantileverltrAttachedSpreadsheet-120821.pdf?VersionId=fyFz2Ac9HFDyp0yWa83WphujK.KJHEVS.

a voluntary standards-setting subcommittee on bassinets organized through ASTM International, a standards-setting organization. The fifth death occurred in 2022 after the letter was sent.

7.　　According to incident reports from the CPSC's public database SaferProducts.gov, at least two deaths occurred in the Ingenuity Dream & Grow Bedside Bassinet: a 4-month-old boy died in August 2019, and a 1-month-old girl died in January 2022.  In both cases, the babies were put down to sleep on their back but were later found on their stomach.

8.　　Defendant's labels and marketing claims deceive parents of young children by making them believe that the Products are safe for use as baby bassinets without revealing that the Products, by virtue of their design, cannot maintain a level surface and that the inclined surface poses a significant risk of suffocation.

9.　　Defendant failed to disclose this material safety information to consumers in the United States.

10.　　Defendant consciously chose to market their Products in a way that concealed all of this information from consumers.

11.　　Despite knowing that their representations regarding the features, attributes, and safety of the Products are deceptive and misleading, omit material safety information, and constitute a fraud on consumers, Defendant continues to manufacture, label, sell, distribute, advertise, and market the Products in a false,

misleading, unfair, and deceptive manner.

12.     If Plaintiff and those similarly situated had known the truth, they would not have purchased the Products, or at minimum, would have paid less for the Products.

13.     Because Defendant actively concealed material safety information from consumers, and made affirmative misrepresentations, parents bought the Products in reliance on the numerous express and implied promises, representations, assurances and/or affirmations from Defendant.

14.     Plaintiff, on behalf of herself and those similarly situated, brings claims for fraudulent concealment, breach of warranty, and violation of the Florida Unfair & Deceptive Trade Practices Act. Plaintiff seeks damages, injunctive and declaratory relief, interest, costs and reasonable attorneys' fees.

## II.    PARTIES

15.     Plaintiff Rebecca Archila is and was at all relevant times a citizen of the State of Florida residing in Broward County.

16.     Defendant Kids2, LLC, f/k/a Kids2, Inc. is a Georgia limited liability company with its principal place of business at 3333 Piedmont Road, Suite 1800, Atlanta, GA 30305. Prior to December 29, 2023, Kids2 was known as Kids2, Inc. before filing conversion paperwork with the Secretary of State of Georgia to become a limited liability company under the name "Kids2, LLC." Upon

information and belief, at least one member of the LLC is a citizen of Georgia

17.      Defendant designs, manufactures, markets, sells, and distributes the Products throughout the United States.

## III.  JURISDICTION & VENUE

18.      This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 (hereinafter, "CAFA"), codified as 28 U.S.C. § 1332(d)(2). The Plaintiff and one or more of the class of plaintiffs are diverse from at least one of Defendant's members. Further, Plaintiff alleges that the matter in controversy exceeds $5,000,000.00 in the aggregate, exclusive of interest and costs, and that the number of class members is greater than 100.

19.      The Court has personal jurisdiction over Defendant because it maintains its principal places of business in this District, and regularly conducts business in this District and/or under the stream of commerce doctrine causes products to be sold in this District, including the Products purchased by Plaintiff and the Class.

20.      Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within this District. Defendant maintains its principal places of business in this District, and caused its Products to be offered for sale and sold to the public in this District.

## IV.   FACTUAL ALLEGATIONS

### A.   Company Background

21.    According to the "About Us" page on the Kids2 website, the company has been "inventing and reinventing baby toys and gear for over 50 years, delighting babies and their parents with award-winning designs that deliver exceptional value."  The website goes on to state: "It all started with a simple, yet remarkably ingenious product that was a game changer for new parents. Now, over 500 products later, Kids2 is one of the fastest growing baby products companies in the world."

22.    The "About Us" page also highlights the manufacturing and design process employed Kids2: "Innovation and manufacturing are at the forefront of product design and development at our Winvention manufacturing facility. In April 2020, we opened our fully owned and operated 250,000 square-foot facility near the Jiujiang Port in Central China tripling our overall workforce and fueling our expansion in China."

23.    In other words, according to Defendant, it is an experienced, well-funded, knowledgeable, and industry-leading designer and manufacturer of baby products.

### B.   The Products are Defective, Unsafe, and Endanger Babies

24.    The Products contain a safety design defect in the form of an unreasonable risk of physical harm: namely, suffocation.  The Products are

incapable of maintaining a level surface, causing babies to end up in dangerous and deadly positions.

25.     According to safe infant sleep guidance from the American Academy of Pediatrics[2], babies should sleep on their back on a firm, flat surface. Every year in the U.S., around 3,500 babies die suddenly in their sleep, and many of those deaths are thought to be due in part to unsafe sleep environments.

26.     Similarly, the CPSC's position on bassinets is that they should be **completely flat**, with an incline of 0 degrees (with room for error not to exceed 1 degree), according to communication that agency staff had in 2023 with a safety-standards group for bassinets.

27.     The U.S. Surgeon General and the U.S. National Institute of Child Health and Human Development (NICHD) agree that infants should be put to sleep on their backs as opposed to their stomachs or sides. This is because studies show that the risk of SIDS increases when infants sleep facing downward in a prone position.[3]

28.     In addition to placing babies on their backs, the National Institutes of Health recommends that parents and caregivers can "reduce [their] baby's risk

---

[2] https://www.aap.org/en/patient-care/safe-sleep/ (last accessed February 7, 2024).
[3] Mitchell EA, et al. *Changing Infants' Sleep Position Increases Risk of Sudden Infant Death Syndrome. New Zealand Cot Death Study*. Arch. Pediatr. Adolesc. Med., 153(11):1136-41. (1999), available at https://pubmed.ncbi.nlm.nih.gov/10555714/.

of SIDS and other sleep-related causes of infant death" by using a "firm, ***flat*** and ***level*** sleep surface."[4]  This is because when the bed is sloped, the infant slides and or rolls into the side of the bassinet or crib.[5]

29.    However, the Products are "cantilevered," meaning they are supported on only one side. That is, a cantilever is a rigid structural element that extends horizontally and is supported at only one end, which has been recognized by the child products industry, including the CPSC, as problematic and dangerous.[6] Per accounts from numerous online reviews and complaints to the CPSC, the Products lack stability, which can cause babies to roll into the sides of the bassinets, or even onto their stomachs, posing a serious risk of suffocation.

30.    The CPSC is aware of at least five infant deaths related to cantilevered bassinets since 2019. Four were cited in a 2021 letter from the agency to the chair of a voluntary standards-setting subcommittee on bassinets organized through ASTM International, a standards-setting organization. The fifth death occurred in 2022 after the letter was sent.

---

[4] *What Does A Safe Sleep Environment Look Like?*, U.S. Dept. of Health and Human Services, National Institute of Health, (August 2022) NIH Pub. No. 22-HD-5759.
[5] *Id.*
[6] CPSC Staff Letter to ASTM Subcommittee Chair for Bassinets, CPSC.gov (December 7, 2021), available at https://www.cpsc.gov/s3fs-public/BassinetwcantileverltrAttachedSpreadsheet-120821.pdf?VersionId=fyFz2Ac9HFDyp0yWa83WphujK.KJHEVS.

31.     According to incident reports from the agency's public database SaferProducts.gov, at least *two deaths* occurred in the Ingenuity Dream & Grow Bedside Bassinet: A 4-month-old boy died in August 2019, and a 1-month-old girl died in January 2022. In both cases, the babies were put down to sleep on their back but were later found on their stomach.

32.     Additionally, at least seven close calls that didn't involve injury were published to the CPSC database concerning the Ingenuity Dream & Grow Bedside Bassinet.  For example, a September 2019 incident report stated: "I placed my baby in it according to directions, she was only 2 weeks old at the time . . . I woke up a few hours later to her face-down in the side corner of the bassinet. She does not have the ability to roll yet (she's still way too young AND a preemie!), so it's not possible that she rolled there on her own. I believe the bassinet bottom tilted and she shifted her weight and that caused her to roll to the side, with her face shoved into the corner. I believe we're lucky that she didn't suffocate."  The parent also included a photo, with a teddy bear demonstrating the position that the baby was found in.

33.     Again, however, the Products' cantilevered design renders them incapable of maintaining a firm, flat surface on which babies can safely sleep. Instead, the Products are unstable and manifest an inclined surface under normal use.  This makes it difficult for babies to not roll over while they sleep.  Once babies

9

have rolled onto their side against a wall or onto their stomach, they can then get trapped in an unsafe sleeping position and suffocate.

34.    In light of the above reports, the organization Consumer Reports tested and assessed the Products in a lab with a level. Consumer Reports substantiated the above risks and claims, noting a "concerning tilt" to the Products when a weight was placed inside.[7]  "Some bassinets with a cantilever design are found to pose a risk in the sleep surface as it may tilt and cause an infant to roll, based on CR's safety team's evaluation," says Ashita Kapoor, associate director of product safety at Consumer Reports.[8] "We are encouraging stronger performance requirements to reduce the possibility that infants will roll over."[9]

35.    The Products are substantially similar in the context of this case: they are all baby bassinets and contain the same dangerously defective cantilever design with a heightened and undisclosed risk of suffocation.

36.    The defect at issue involves a critical safety-related feature, and it is unsafe to use the Products as designed.  The alleged level surface and cantilever design are also central to the performance of the Products. Absent a functioning level surface and adequate support from the Products' frame, the Products are

---

[7] https://www.consumerreports.org/babies-kids/bassinets/ingenuity-and-halo-bassinets-tilt-dangerously-safety-risk-a8700348394/ (last accessed February 7, 2024).

[8] *Id.*

[9] *Id.*

incapable of safe use and are worthless.

37.     Consumers reasonably expect that baby bassinets are safe for their intended purpose—sleeping. Consumers would not anticipate that a product specifically made for babies and marketed as such is designed in a manner that could seriously injure babies with normal, everyday use.

38.     The safety defect renders the Products unfit for the ordinary purpose they are used.

39.     The safety defect is present in all Products at the time of sale because it is inherent in the design of the Products and is present when the Products come off the assembly line.

40.     Had Plaintiff, the Class, and the consuming public known that the Products were defectively designed and posed an unreasonable risk of suffocation and death, they would not have purchased the Products at all, or on the same terms for the same price.

### C.     The Products Have Garnered Over 100 Negative Reviews Regarding Dangerous Leveling

41.     In the past four years, the Ingenuity Dream & Grow Bedside Bassinet has earned well over 100 poor reviews that mention this issue – i.e., uneven surface, unstable product, infants rolling over, and infants getting jammed on mesh siding – on the manufacturer's site and other sites where it's sold, including Target, Amazon, and Walmart (where the products are offered for sale at

retail prices in excess of $120).

42.    On Target.com, roughly a quarter of the reviews (115 out of 443) have just one star. They have headings like "Dangerous" and "Not safe!" and "Tilted, Crooked. Do not buy!"  Representative examples are shown below.



**Not level and wheels terrible**

★☆☆☆☆  |  Would not recommend

Becksies - 1 year ago

The bassinet is not level (literally used a level to check) and my baby always rolls to one side even though she is always placed in the center. The wheels are terrible and don't roll smoothly on hardwood, tile, or carpet. Regrettable purchase.

> **1 reply from Kids2 team - 1 year ago**
>
> Hi! We're sorry to hear your experience with the Ingenuity Dream & Grow Bedside Bassinet - Dalton was disappointing. We would like to see how we can address your concerns as soon as possible by connecting with you directly. Please give us a call at 800-230-8190 Monday - Friday 8 am - 5 pm EST.



**Do not buy**

★☆☆☆☆  |  Would not recommend

Do not buy - 1 year ago

Like the other reviews said, the bassinet is slanted so baby keeps rolling into mesh and waking up. I had horrible sleep as I was worried baby had difficulty breathing due to rolling over so close into the mesh. At first I thought baby was rolling on his own but then realized it was only on this bassinet. I can't even return it now as I've had it for too long. Also it does not last a year like it says, my baby outgrew it at 2-3 months. What a waste!



## BABY WILL BE SMASHED INTO MESH SIDING



Ravenm - 1 year ago, Verified purchaser

Okay so I should've been more thorough when buying a bassinet I wish I would've read more reviews I'm not the only person who is having this problem. My newborn has only slept in this for a few nights but everytime h wakes up he's literally smashed into the mesh siding! How a newborn can move from the middle of the bassinet on his back to being on his side with his face smashed into the mesh. I wanted to write this review ar now I'm contacting them about returning this it's not safe enough for my son to be sleeping in .

**1 reply from Kids2 team - 1 year ago**

Hi! We're sorry to hear your experience with the Ingenuity Dream & Grow Bedside Bassinet - Dalton was disappointing. Safety is a top priority for Ingenuity, which is why our products go through extensive 3rd party testing to meet required safety standards. We would like to see how we can address your concerns as soon as possible by connecting with you directly. Please give us a call at 800-230-8190 Monday - Friday 8 am - 5 pm EST.

## DO NOT PURCHASE - NOT LEVEL!



hba9322 - 1 year ago

This bassinet does not sit level! Our baby was constantly rolling over to her side because this death trap is slanted! 100% do not recommend!

**1 reply from Kids2 team - 1 year ago**

Hi! We're sorry to hear your experience with the Ingenuity Dream & Grow Bedside Baby Bassinet Adjustable Height Crib was disappointing. Safety is a top priority for Ingenuity, which is why our products go through extensive 3rd party testing to meet required safety standards. We would like to see how we can address your concerns as soon as possible by connecting with you directly. Please give us a call at 800-230-8190 Monday - Friday 8 am - 5 pm EST.

## Do not recommend

 Would not recommend

New Mom - 1 year ago

Moves and sways while baby is inside. It is not a stable bassinet or ideal for a sleeping infant.

> **1 reply from Kids2 team - 1 year ago**
>
> Hi! We're sorry to hear your experience with the Ingenuity Dream & Grow Bedside Bassinet - Dalton was disappointing. Safety is a top priority for Ingenuity, which is why our products go through extensive 3rd party testing to meet required safety standards. We would like to see how we can address your concerns as soon as possible by connecting with you directly. Please give us a call at 800-230-8190 Monday - Friday 8 am - 5 pm EST.

## Don't waste your money.

 | Would not recommend

Mom - 8 months ago, Verified purchaser

Don't buy this bassinet. My baby literally hates it. Mattress is like a thick piece of cardboard, not to mention material it's made out of is noisy. Like all of the other reviews say, it's not even and baby ends up on her side. She won't last more than 10 minutes sleeping in this bassinet. Waste of money, very disappointed.

> **1 reply from Kids2 team - 8 months ago**
>
> Hi! We're sorry to hear your experience with the Ingenuity Dream & Grow Bedside Bassinet - Dalton was disappointing. We would like to see how we can address your concerns as soon as possible by connecting with you directly. Please give us a call at 800-230-8190 Monday - Friday 8 am - 5 pm EST.

14

## Please think before buying

 | Would not recommend

Alytis - 8 days ago

It tilts on one side when the baby is placed its actually in review for a recall due to baby suffocation and death. We threw ours out

> **💬 1 reply from Kids2 team - 6 days ago**
>
> Our team always wants to be helpful! We value feedback and are sorry that your experience with the Ingenuity Dream & Grow Bedside Bassinet was unsatisfactory. So that we may assist you as quickly as possible, please call us at 800-230-8190 Monday-Friday, 9 a.m. - 5 p.m. EST.

## Dont buy, safety hazard

 | Would not recommend

Danica - 1 year ago

These should be recalled. There is a slant and my newborn kept rolling on her side. It's a serious safety hazard and I can't believe these are still on the market. Had to dis assemble and return mine, such a hassle.

> **💬 1 reply from Kids2 team - 1 year ago**
>
> Hi! We're sorry to hear your experience with the Ingenuity Dream & Grow Bedside Bassinet was disappointing. Safety is a top priority for Ingenuity, which is why our products go through extensive 3rd party testing to meet required safety standards. We would like to see how we can address your concerns as soon as possible by connecting with you directly. Please give us a call at 800-230-8190 Monday - Friday 8 am - 5 pm EST.

### Assembles at a slant- serious safety risk

 | 🗨 Would not recommend

MD - 1 year ago

My husband and I received this as a gift for our baby due soon. It seemed like a great option until I put it together. After assembling it correctly, we both noticed that the bassinet (including the mattress) is at a slant with no way to fix the problem. Other individuals have said that this common problem with the bassinet has led to their newborns rolling over in their sleep. This is a terrifying problem that we were not willing to risk with our newborn. The extra mesh fabric that puffs out inside when the bassinet is lifted to the higher position also seems like a serious safety hazard. We decided to return it, however, it was almost impossible to disassemble and left me only more frustrated. It is seriously a complete waste of time and especially do not buy if you want a safe sleeping space for your baby.

💬 **1 reply from Kids2 team - 1 year ago**

Hi MD, we're sorry to hear your experience with the Ingenuity Dream & Grow Bedside Baby Bassinet Adjustable Height Crib was disappointing. Safety is a top priority for Ingenuity, which is why our products go through extensive 3rd party testing to meet required safety standards. We would like to see how we can address your concerns as soon as possible by connecting with you directly. Please give us a call at 800-230-8190 Monday - Friday 8 am - 5 pm EST.

### SUFFOCATION RISK DO NOT BUY

 | 🗨 Would not recommend

Amanda - 2 years ago

I received this bassinet as a gift and did not research it. Like others have said, it's almost impossible to keep level and the mesh starts about an inch from the mattress and doesn't go all the way around. On two occasions my 6 week old baby rolled to one side and was stuck with her face against fabric. It was terrifying to think of what could have happened had I not woken up to check on her. I can't believe with all the close call comments this thing is still being sold.

💬 **1 reply from Kids2 team - 2 years ago**

Hi, this is Sarah from Ingenuity. We're sorry you were disappointed with our product. We always want to surpass expectations, so please reach out to our Consumer Services team at 800-230-8190 Monday -Friday 8 am -5 pm EST. We would be happy to see how we can help!

### Tilted, Crooked. Do not buy!

 | 🗨 Would not recommend

JG3256 - 2 years ago

As mentioned in previous reviews, the wheels are awful and the whole bassinet portion is crooked. Baby keeps rolling into mesh and waking up. Took light off and use it on new one from my sister. Do not buy this!!!

💬 **1 reply from Kids2 team - 2 years ago**

Hi, this is Sarah from Ingenuity. We're sorry you were disappointed with our product. We always want to surpass expectations, so please reach out to our Consumer Services team at 800-230-8190 Monday -Friday 8 am -5 pm EST. We would be happy to see how we can help!





**Horrible design, mattress has no support, slants.**

Melissa18 - 6 years ago
originally posted on kidsii.com

Bought this for my niece tried it out 2 nights in a row and she had rolled to the side in result of no support to keep the mattress level. This product is a suffocation hazard her face was in the crack of the side both times.

43.     On the Walmart website, similar reviews were posted by frustrated purchasers.  Representative examples are shown below.



★☆☆☆☆                                                   1/18/2024

**Dangerous product**

Baby is only 9lbs and can tilt the mattress enough to slide to the side pushing her face against the mesh! Thank God it's mesh but this is terribly dangerous. Will be junking this expensive piece of crap and buying a regular bassinet.

Kayla

👍 0    👎 0

Kids2

Your feedback is very important to us. Please know we will do everything we can to make sure that your child always has a happy, enjoyable, and safe experience with our products. You can reach our support team at 800-230-8190 Monday through Friday, 9 AM to 5 PM EST, to discuss the bassinet. See less

★☆☆☆☆  Verified Purchase             9/13/2021

**Won't recommend**

Ive had this item for a while and just started using it. My baby is 5 months and about 16-18lbs won't, I won't recommend because when you put the child in the bed leans and the my baby hands get stuck under the little padding that comes with it!! That's a safety concern!! I really wish I used it sooner and could have returned it!!!

Chinelle

👍 0    👎 0

Supplier Response

Hi, this is Sarah from Ingenuity. Thank you for your feedback. We're sorry you were disappointed with our product. Please reach out to our Consumer Services team at 800-230-8190 Monday -Friday 8 am -5 pm EST. We would like to see how we can improve your experience. See less

★☆☆☆☆                                        12/30/2018

**Not safe! Do not buy!**

We bought this for our son at a local walmart and I have
not been able to use this bassinet once! Everytime I put
him in, he rolls all the way to the side. This product needs a
complete recall! Not safe I would never reccomend this
product to anyone!!

Brittany    Walmart Associate

👍 0      👎 0

---

★☆☆☆☆                                        8/31/2019

**Possible Suffocation**

Leans to the side, leaving my son stuck in the side when he
wakes up and his face in the mesh. The "support board"
isn't very supportive either. It's not very thick or doesnt
have a support in the middle, causing it to bend. I do not
recommend.

Defective

👍 1      👎 0

---

★☆☆☆☆                                        3/8/2020

This felt very unstable and leaned to one side so baby kept
ending up pressed against the mesh. I got rid of it after a
week. Not with the money at all.

lissette

👍 5      👎 0



44.     On the Kids2 website, similar reviews were posted by frustrated purchasers.  Representative examples are shown below.



**NOT SAFE!!!**

A YEAR AGO

This product is a great concept but horrible execution… with the full support only being on one side of the bassinet, the mattress ends up not being level. I just brought my 5 day old home from the NICU and when I laid him in this, swaddled, he raised his legs and started to roll into the side. Had I not been standing there watching him, he would've rolled straight into the side of this! Hopefully parents are aware of the dangers here and stop using this bassinet before something happens to their baby!



**Extremely dangerous**

A YEAR AGO

This thing is almost an inch off level from one side to the other. Baby pretty much rolls away. Not sure if the goal of this company is to make a poor quality product that endangers the lives of infants or what but after seeing the quality of this thing I would not trust this company to make a toothpick. Please find a better product for your baby



**Terrible**

2 YEARS AGO

My newborn always ends up with his face in the mesh lining. Not level at all even when the mattress is velcroed down.

**Horrible**

2 YEARS AGO

I bought this bassinet 2 weeks ago and since then it has started to creak get wobbly and the mattress is uneven so my son ends up with his face in the mesh. I would have returned it but i ended up throwing away the box. Using this bassinet gives me anxiety everyday.

### D.    Defendant Knew About the Latent Safety Defect

45.    Defendant was aware of this latent design defect and the result risk of injury for years, since at least late 2018 as a result of the CPSC incident reports and consumer reviews discussed above.

46.    Not only does the number of complaints over the course of several years demonstrate that Defendant was on notice of the safety defect, but the substance of the complaints shows that consumers were surprised, frustrated, and disappointed with the poor quality of the Products, and would not have purchased the Products had the defect been disclosed.

47.    Further, the volume of negative reviews raising the exact same defect—which Defendant views, aggregates, and often responds to—is unusually large and is indicative of a widespread problem. Negative reviews accusing products of being highly unsafe are uncommon, particularly in the baby products sector where safety is paramount. On information and belief, where, as here,

multiple such reviews are published, Defendant conducts further testing in response, which would have confirmed the safety risk.

48.    Defendant regularly receives and monitors consumer complaints submitted to the CPSC and responds to such complaints and inquiries. The CPSC also automatically informs manufacturers whenever they receive a complaint about a physical danger. As such, Defendant would have received and seen the CPSC incident reports discussed above.

49.    Additionally, Defendant would have seen the above-described warnings and negative reviews on its own website and third-party retailer websites. Online Reputation Management (ORM) is now a standard business practice among major companies and entails monitoring consumer forums, social media, and other sources on the internet where consumers can review or comment on products. ORM involves the monitoring of the reputation of an individual or a brand on the internet, addressing content, which is potentially damaging to it, and using customer feedback to try to solve problems before they damage the individual's or brand's reputation. Many companies offer ORM consulting services for businesses.

50.    Like most companies, Defendant cares about its reputation and regularly monitors online customer reviews because they provide valuable data regarding quality control issues, customer satisfaction, and marketing analytics. One and two-star reviews like those displayed above would be particularly

attention-grabbing for Defendant's management because extreme reviews are often the result of material problems. As such, Defendant's management knew about the above-referenced consumer complaints shortly after each complaint was posted on Defendant's company website and third-party retailer websites.

51.     Moreover, Defendant is experienced in designing and manufacturing baby products such as the Products. As an experienced manufacturer, Defendant conducts pre-sale and post-sale safety testing to verify the safety risks posed to users of the Products. On information and belief, Defendant discovered this safety risk during testing both before and after publicly releasing the Products for sale, but made a business decision not to take action, including redesigning and recalling the Products.

52.     Finally, Defendant also would have had notice of the defect as a result of product warranty claims.  On information and belief, before accepting a return or performing a repair, Defendant's policy is to ask each customer for a description of the request and to keep track of the reasons given. Descriptions provided with returns and/or repair requests of the Products therefore would have disclosed the defect.

### E.     Defendant Fails to Disclose the Latent Safety Defect to Consumers at the Point of Sale

53.     Defendant has never warned consumers regarding the Products' latent safety defect and risk of suffocation due to inadequate leveling.

54.     Consumers cannot reasonably know about or discover the dangerous nature of the Products at the point of sale, prior to purchase.

55.     Although images and a description of the bassinets are contained on product packaging and online listings, consumers do not realize that there is a material and unreasonable risk of suffocation through regular and ordinary use.

56.     Consumers reasonably expect that Defendant—who has far greater expertise in product safety and designing baby products—would not market an unsafe product. For lay consumers inexperienced in product design, the Products are not obviously unsafe in appearance.

57.     Defendant advertises the Dream & Grow Bedside Bassinet on its packaging as: (1) "Unique depth adjust extends bassinet use up to 12 months," (2) "Frame height adjusts to keep baby close," and (3) "Music and soothing sounds." The front panel of the packaging also depicts a picture of a baby resting comfortably on his back.

58.     Despite advertising these purportedly positive attributes regarding relating to safe and comfortable usage, Defendant failed to disclose, let alone prominently, the risk of suffocation due to the defect at the point of purchase.

### F.     Defendant's Duty to Disclose the Defect

59.     Superior Knowledge: As described above, Defendant is experienced in the design and manufacture of baby products such as the Products. As an

24

experienced manufacturer, Defendant conducts tests, including pre-sale testing, to verify the products it sells are free from safety defects and align with Defendant's specifications and intended use. Defendant also receives, monitors, and aggregates consumer complaints regarding the defect. A reasonable consumer would not be on notice of the defect and does not have access to the granular data in Defendant's possession.

60.    Active Concealment: Defendant actively concealed the Defect. As described above, Defendant actively concealed the defect from Plaintiff and the Class. Defendant responded to negative reviews about the defect without publicly acknowledging the defect, and instead merely directed the reviewer to contact Defendant for more information. Additionally, upon information and belief, in response to consumer complaints within the warranty period regarding the defect, Defendant replaced the defective Products with the same defective Products, or denied the warranty claim entirety.

61.    Partial Representations: As described above, Defendant represents on labeling that each Product functions as a baby bassinet with various attributes for ease and comfort. The same and substantively identical representations are made on third-party retailer websites (and Defendant's website), which were written by Defendant and provided to retailers by Defendant. Yet Defendant fails to disclose the latent safety defect or the attendant risk of suffocation and death.

25

By disclosing some beneficial attributes about the Products and describing its performance, Defendant is obligated to disclose material defects that negatively affect the useful life of the Products.

62.    The defect affects the central functionality of the Products in that it renders the Products inoperable without unreasonable risk of physical injury.  For the same reasons, the Products present an unreasonable safety hazard.

63.    Defendant could have and should have prominently disclosed the defect on product packaging, on the product listings on its website, and to third-party retailers.  Had Defendant disclosed the defect in this manner, consumers would have been aware of it.

### G.    The Safety Risks and Latent Defect Associated with Normal Use of the Products Renders Them Worthless or Diminished in Value

64.    As a result of the safety risks to babies associated with the use of the Products, together with Defendant's concealment and omission of these risks from the date they were first reported to Defendant or discovered by Defendant and continuing through the present, as the Products were not recalled, the Products have been rendered entirely worthless or, at the very least, have been substantially diminished in value.

65.    The known safety risks to babies, described above, have rendered the Products worthless. If users choose to discontinue using the Products for fear of injury (or repeat injury), they must pay for another expensive replacement

26

product.

66.    Rather than recall the Products or even instruct users to place them away, Defendant continues to sell the products and market them as usable.

67.    In so doing, Defendant places the blame and burden on parents for purchasing its dangerous Products instead of shouldering any responsibility for the defect whatsoever. In other words, Defendant is actively concealing the safety defect.

68.    If Defendant disclosed the danger presented by the Products, demand would quickly drop, which would cause the market price of the Products to plummet. Thus, due to Defendant's concealment and omissions, Plaintiff and class members paid a price premium and sustained economic injuries.

## V.    PLAINTIFF ALLEGATIONS

69.    On or about June 25, 2022, Plaintiff Archila purchased an Ingenuity Dream & Grow Bedside Bassinet from a buybuyBaby store in Broward County, Florida.

70.    Before purchasing the Product, Plaintiff viewed the external packaging and saw that it was labeled as a baby bassinet with (1) "Unique depth adjust extends bassinet use up to 12 months," (2) "Frame height adjusts to keep baby close," and (3) "Music and soothing sounds."  On the front panel of the packaging, she also saw a picture of a baby resting comfortably in the bassinet and

on his back.

71.    As a reasonable consumer, she believed that information regarding critical safety defects, like the inability to maintain a level surface and the related risk of suffocation and death under normal use, would have been prominently disclosed by the manufacturer on the packaging. Because no such risk was disclosed, let alone prominently on the front panel, she understood the label statements and accompanying images as representations made by Defendant that the Product was safe under ordinary use. Plaintiff relied on Defendant's omissions in purchasing the Product.

72.    Had Plaintiff been made aware of the defect in the Product, she would not have purchased it or would have paid significantly less for it. At a minimum, Plaintiff paid a price premium for the Product based on Defendant's omission and concealment of the safety defect.

73.    Plaintiff would purchase another similar bassinet from Defendant in the future if the bassinet was redesigned to make it safe under ordinary use. Plaintiff, however, faces an imminent threat of harm because she will not be able to rely on any representations or omissions of safety and the comprehensiveness of warnings in the future and, thus, will not be able to purchase such a bassinet manufactured by Defendant.

## VI.   TO THE EXTENT DEFENDANT ATTEMPTED TO DISCLAIM ANY WARRANTIES, SUCH DISCLAIMER IS UNCONSCIONABLE

74.     Defendant publishes its limited warranty policy on its website.[10]

75.     Plaintiff does not allege that the limited warranty was conspicuously disclosed pre-sale or that she had pre-sale notice of the limited warranty.  Nor does Plaintiff allege that the warranty was conspicuously disclosed within product packaging, let alone that she received a written copy of the warranty.

76.     Assuming the limited warranty was contained in the Product packaging, Plaintiff alleges, on information and belief, that the disclaimer is inconspicuous.  On information and belief, the disclaimer is in small font, not bolded or otherwise contrasted from the surrounding text, and buried within a lengthy document.

77.     Regardless, the limited warranty fails of its essential purpose and is unconscionable because (1) the defect exists at the time the Products leave the manufacturing facility; (2) the defect precludes the ability to repair the Products; (3) Defendant fails to disclose its knowledge of the defect when contacted by customers; and (4) when it replaces a Product, it does so with another equally defective Product.

78.     Plaintiff did not have any opportunity to negotiate the terms of the

---

[10] https://www.kids2.com/pages/warranty.

limited warranty.

79.      The defect renders the Products unfit for the ordinary purpose for which they are used, which is to provide babies a safe sleeping environment.

80.      Any replacement warranty fails of its essential purpose because by replacing any of the defective Products with an equally defective Product, this remedy fails to put the goods in their represented condition.

81.      The warranty is unconscionable because it excludes punitive damages notwithstanding Defendant's knowledge and active concealment of the defect.

82.      The warranty is unconscionable because Plaintiff had no meaningful choice in choosing another brand of bassinet, as any other reputable brand would likewise have warranties containing the same or similar terms and limitations.

83.      The warranty is unconscionable because the limitations are grossly inadequate to protect Plaintiff and the Class from the defect.

84.      The warranty is unconscionable because Defendant sold the Products with knowledge of the undisclosed safety defect, and knowing that the Products could not be repaired or replaced with a non-defective Product.

## VII.  TOLLING AND ESTOPPEL OF STATUTE OF LIMITATIONS

85.      Any applicable statutes of limitation have been tolled by the discovery doctrine and Defendant's knowing and active concealment of the defect.

86.     Through no fault or lack of diligence, Plaintiff and members of the Class were deceived regarding the defect and could not reasonably discover the defect or Defendant's deception with respect to the defect.

87.     Prior to purchasing the Products, Plaintiff and Class members had no reasonable way of knowing about the Products' uniformly defective design and unreasonable risk of suffocation and death through ordinary use.  Further, Plaintiff and members of the Class did not discover and did not know facts that would have caused a reasonable person to suspect that Defendant was engaged in the conduct alleged herein.

88.     Further, by failing to provide immediate notice of the defect and related safety risks associated with normal use, by responding to negative reviews about the defect with generic responses and without publicly acknowledging the defect, by continuing to sell the Products with the defect and advertising the Products as safe for babies notwithstanding knowledge of the defect, and by replacing Products under warranty with the same defectively designed Products, Defendant actively concealed the defect from Plaintiff and Class members.

89.     Plaintiff did not learn about the safety defect and risk of suffocation and death under normal use until shortly before she filed this action.  Plaintiff first learned about the safety defect and risk of suffocation and death under normal use within the days prior to filing this action.

31

90.     Plaintiff and the Class justifiably relied on Defendant to disclose the true nature of the products they purchased because that defect was not discoverable through reasonable effort.

91.     Upon information and belief, Defendant intended its acts to conceal the facts and claims from Plaintiff and Class members. Plaintiff and Class members were unaware of the facts alleged herein without any fault or lack of diligence on their part and could not have reasonably discovered Defendant's conduct.

92.     For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Defendant's active concealment.

## VIII.  CLASS ACTION ALLEGATIONS

93.     Plaintiff brings this action on behalf of herself and the following Classes pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure. Specifically, the Classes are defined as:

> **Nationwide Class**: All persons in the United States who purchased the Products for personal use and not for resale during the Class Period.

In the alternative, Plaintiff brings this action on behalf of the following State Subclass:

> **Florida Subclass**: All persons in Florida who purchased the Products for personal use and not for resale during the Class Period.

> **Georgia Subclass**: All persons in Georgia who purchased the Products for personal use and not for resale

during the Class Period.

94.     The Nationwide Class, Florida Subclass, and Georgia Subclass are collectively referred to as the "Class" or "Classes."

95.     Excluded from the Classes are (a) any officers, directors or employees, or immediate family members of the officers, directors, or employees of any Defendant or any entity in which a Defendant has a controlling interest, (b) any legal counsel or employee of legal counsel for any Defendant, (c) the presiding Judge in this lawsuit, as well as the Judge's staff and their immediate family members, and (d) any person who received a full and complete refund for their purchase prior to the filing of this action.

96.     The "Class Period" begins on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, discovery, concealment, and accrual issues, and ending on the date of entry of judgment.

97.     Plaintiff reserves the right to amend the definition of the Classes if discovery or further investigation reveals that the Classes should be expanded or otherwise modified.

98.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of the claims on a class-wide basis using the same evidence as would be used to prove those elements in individual

actions alleging the same claims, and because Plaintiff otherwise meets the requirements of Federal Rule of Civil Procedure 23, as alleged below.

99.     **Numerosity.** The members of the Classes are so numerous that their individual joinder herein is impracticable. On information and belief, members of the Classes number in the thousands to hundreds of thousands and are geographically disbursed throughout the United States. Moreover, joinder of all potential Class members is not practicable given their numbers and geographic diversity. The number of members of the Classes is presently unknown to Plaintiff but may be ascertained from Defendant's books and records and/or from information and records in the possession of Defendant's third-party retailers and distributors. Members of the Classes may be notified of the pendency of this action by mail, email, internet postings, and/or publication.

100.    **Commonality and Predominance.** Common questions of law and fact exist as to all members of the Classes and predominate over questions affecting only individual members of the Classes. Such common questions of law or fact include, but are not limited to, the following:

      a.  Whether the Products are unsafe for babies;

      b.  Whether Defendant knew or reasonably should have known that the Products were unsafe for babies;

      c.  Whether the Products contain an inherent safety defect;

d.  Whether the marketing, advertising, packaging, labeling, and other promotional materials for Defendant's Products are deceptive;

e.  Whether Defendant made material omissions in their marketing, advertising, packaging, labeling, promotion, and sale of the Products;

f.  Whether Defendant made misrepresentations in its marketing, advertising, packaging, labeling, promotion, and sale of the Products;

g.  Whether Defendants concealed from and/or failed to disclose to Plaintiff and Class members that the Products were unsafe for babies;

h.  Whether Defendant's conduct was knowing and willful;

i.  Whether Defendant's actions violate the state consumer fraud statutes invoked below;

j.  Whether Defendant's actions constitute common law fraud;

k.  Whether Plaintiff and Class members were damaged by Defendant's conduct;

l.  Whether Defendant was unjustly enriched at the expense of Plaintiff and Class members;

m.  Whether Defendant should be ordered to disgorge all or part of the ill-gotten profits they received from the sales of the Products;

n.  Whether Defendant breached express warranties to Plaintiff and Class members;

o.  Whether Defendant breached implied warranties to Plaintiff and Class Members; and

35

p.  Whether Plaintiff and Class members are entitled to injunctive relief.

101.  Defendant engaged in a common course of conduct giving rise to the legal rights that Plaintiff seeks to enforce. Similar or identical statutory and common law violations, business practices, and injuries are involved. These common questions, and the common answers they will generate, predominate in both quality and quantity over any individual issues that may exist.

102.  **Typicality.** Plaintiff's claims are typical of the claims of the other members of the Classes because, among other things, all members of the Classes were injured in the same way through Defendant's uniform misconduct, as described above.

103.  **Adequacy of Representation.**  Plaintiff is an adequate Class Representative because their interests do not conflict with the interests of the other Members of the Classes they seek to represent; they have retained counsel competent and experienced in complex class action litigation; and they will prosecute this action vigorously. The Classes' interests will be fairly and adequately protected by Plaintiff.

104.  **Injunctive Relief.**  The elements of Rule 23(b)(2) are met here. Defendant will continue to commit the unlawful practices alleged herein, and Class members will remain at an unreasonable and serious safety risk as a result of the

36

Products. Defendant has acted or refused to act on grounds generally applicable to Plaintiff and the Classes, thereby making appropriate final injunctive relief and declaratory relief, as requested in the Prayer for Relief below, with respect to the Classes as a whole.

105. **Superiority.** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the Classes are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for the Classes to individually seek redress for Defendant's wrongful conduct. Even if members of the Classes could afford individual litigation, the court system could not. Individualized litigation would create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### Count I
### Fraudulent Concealment
**(On Behalf of Plaintiff and the Nationwide Class and, alternatively, the Georgia Subclass and Florida Subclass)**

37

106.    Plaintiff realleges and incorporates by reference all allegations raised in the preceding paragraphs as if fully stated herein.

107.    Plaintiff asserts this claim for common law fraud under an omission or concealment theory.  Plaintiff's claim is brought under Georgia law pursuant to Georgia's choice of law rules.

108.    The claims of absent class members are brought under Georgia law pursuant to Georgia's choice of law rules.

109.    Defendant made pervasive and consistent statements regarding the beneficial attributes and safety of the Products that concealed, suppressed, omitted, and failed to disclose material facts necessary to make those statements not misleading. As detailed above (*see, e.g.* Paragraphs 53-58, *supra*), Defendant made statements describing the equipment and features of the Products on labels, packaging, and advertisements. These statements represented that the Products were "safe" for babies under normal use.

110.    Defendant knowingly and willfully concealed and suppressed material facts regarding Products, namely, the existence of the latent safety defect and attendant risk of suffocation and death described above. (*See, e.g.* Paragraphs 41-52, *supra*).

111.    Defendant's omissions of material facts were made to Plaintiff and the Classes each time they purchased the Products.

112.    Defendant knew that these omissions were material.   Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer. This is particularly true for baby products, for which reasonable consumers expect unqualified safety.

113.    Defendant intended that its omissions of material facts would induce Plaintiff and the Classes to purchase the Products.

114.    Plaintiff and the Classes reasonably relied on the omissions of material facts regarding the Products as described above. (*See, e.g.*, Paragraphs 69-73, *supra*).

115.    Plaintiff and the Classes would not have purchased, or at minimum would have paid less for, Defendant's Products had they been accurately marketed, advertised, packaged, and sold.

116.    Plaintiff and the Classes did not know that their Products were defectively designed, were incapable of maintaining a level and flat sleeping surface, and posed a risk of suffocation and death under normal use. Nor could Plaintiff and the Classes have discovered these concealed facts through reasonably diligent investigation.

117.    The omitted facts concern a latent defect. Defendant did not fully and truthfully disclose to its customers the true nature of the latent defect, which was not readily discoverable at the time pf purchase. A reasonable consumer would not have

expected a latent defect in a new baby product and especially not one that creates a dangerous condition, or a risk of death, or which renders the product unsuitable for safe sleeping.

118.    Defendant has a duty to disclose the truth regarding the safety of its Products, because the safety of the Products has a direct impact on the health and safety of the children who occupy them. This duty arose from the fact that Defendant (1) had exclusive and/or far superior knowledge and access to the material, suppressed facts regarding the Products' testing; (2) affirmatively and intentionally concealed the material facts from Plaintiff and Class members; and (3) made partial statements regarding the attributes and benefits of the Products without disclosing material safety limitations.

119.    Defendant's omissions of material facts directly and proximately caused the damages suffered by Plaintiff and members of the Classes in an amount to be proven at trial.

120.    Defendant's conduct showed willful misconduct, malice, fraud, wantonness, oppression, motive, a reckless disregard of the truth, and an entire want of care raising the presumption of conscious indifference to consequences such that an award of punitive damages is appropriate.

121.    Because Defendant's deceptive and unfair conduct is ongoing, injunctive relief is necessary and proper.

**Count II**
**Breach of Implied Warranty - Fla. Stat. § 672.314**
**(On Behalf of Plaintiff and the Florida Subclass)**

122.    Plaintiff realleges and incorporates by reference all allegations raised in paragraphs 1-105 as if fully stated herein.

123.    Florida law states that "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Fla. Stat. § 672.314(1).

124.    Defendant is and was at all relevant times a "merchant" as defined by Fla. Stat. § 672.104(1).

125.    Florida Plaintiff and members of the Florida Subclass purchased Products manufactured and marketed by Defendant by and through Defendant's authorized sellers for retail sale to consumers, or were otherwise expected to be the third-party beneficiaries of Defendant's contracts with authorized sellers, or eventual purchasers when bought from a third party.

126.    At all relevant times, Defendant was a merchant, manufacturer, marketer, warrantor, and/or seller of the Products. Defendant knew or had reason to know of the specific use for which the Products were purchased.

127.    The Products are and were at all relevant times goods within the meaning of Fla. Stat. § 672.105(1).

128.    Defendant impliedly warranted that the Products (1) were in

merchantable condition and fit for its ordinary purpose, (2) would pass without objection in the trade, (3) be of fair and average quality, and (4) conform to the promises and affirmations made by Defendant.

129.    However, when sold, and at all times thereafter, the Products were not in merchantable condition, and were not fit for the ordinary purpose of providing babies a safe and reliable sleeping environment, because the Products contain a defect rendering them unsafe and present undisclosed safety risks to babies as discussed above. Thus, Defendant breached its implied warranty of merchantability for the ordinary purpose for which the Products are purchased and used.

130.    Additionally, the Products would not pass without objection in the trade because of the safety defect.  Industry standards require that baby bassinets be completely flat and level, with 0 degrees of incline.

131.    Additionally, the Products do not conform to the affirmations on its label.  The label depicts a baby sleeping safely on a flat surface and on his back. But as explained above, the Products are defective and incapable of maintaining a flat sleeping surface with a 0 degree incline.

132.    Plaintiff and Class members had sufficient direct dealings with Defendant's authorized retailers to establish privity of contract between Defendant, on the one hand, and Plaintiff and each Class member, on the other hand.

133.    Privity is not required because Plaintiff and each of the Class members are the intended third-party beneficiaries of Defendant's warranties and its sale through authorized retailers. The retailers were not intended to be the ultimate consumers of the Products and have no rights under the warranties provided by Defendant. Defendant's warranties were designed for and intended to benefit the consumer only and Plaintiff and Class members were the intended beneficiaries of the Products. In other words, the contracts are intended to benefit the ultimate consumer or user of the Products.

134.    Defendant's manifest intent that its warranties apply to Plaintiff and Class members as third-party beneficiaries is evident from the statements contained in its online "Warranty Policy," which states that it "applies only to single family use only for the original purchaser/gift recipient" and "covers purchases solely from an authorized retailer or distributor."

135.    Defendant was put on notice about its breach through consumer warranty claims, its review of consumer complaints and other incident reports described herein, and on information and belief, through its own internal testing.

136.    Defendant cannot disclaim its implied warranty as it knowingly sold unsafe and hazardous Products.

137.    Plaintiff provided Defendant with reasonable notice of breach via letter and email on February 8, 2024.

138.    As a direct and proximate result of Defenant's breach of the implied warranty of merchantability, Plaintiff and members of the Florida Subclass have been damaged in an amount to be proven at trial.

## Count III
## Breach of Express Warranty - Fla. Stat. § 672.313
### (On Behalf of Plaintiff and the Florida Subclass)

139.    Plaintiff realleges and incorporates by reference all allegations raised in the paragraphs 1-105 as if fully stated herein.

140.    Defendant is and was at all relevant times a "merchant" as defined by Fla. Stat. § 672.104(1).

141.    Florida Plaintiff and members of the Florida Subclass purchased Products manufactured and marketed by Defendant by and through Defendant's authorized sellers for retail sale to consumers, or were otherwise expected to be the third-party beneficiaries of Defendant's contracts with authorized sellers, or eventual purchasers when bought from a third party.

142.    At all relevant times, Defendant was a merchant, manufacturer, marketer, warrantor, and/or seller of the Products. Defendant knew or had reason to know of the specific use for which the Products were purchased.

143.    The Products are and were at all relevant times goods within the meaning of Fla. Stat. § 672.105(1).

144.    Fla. Stat. § 672.313 provides that: "(1) Express warranties by the

seller are created as follows: (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise. (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description. [and] (c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model."

145.    In connection with the purchase of the Products, Defendant provided an express warranty through exterior labeling and marketing. The warranty provided that the Products would provide a safe sleeping environment for babies under normal use.   The warranty is based on the following label statements, collectively: (1) "Unique depth adjust extends bassinet use up to 12 months," (2) "Frame height adjusts to keep baby close," (3) "Music and soothing sounds," and (4) an image of a baby resting comfortably in the bassinet and on his back.

146.    The representations creating the express warranty became a basis of the bargain and Plaintiff and the Florida Class relied upon them in making their purchases.

147.    However, when sold, and at all times thereafter, the Products were not in merchantable condition, and were not fit for the ordinary purpose of

providing babies a safe and reliable sleeping environment, because the Products contain a defect rendering them unsafe and present undisclosed safety risks to babies as discussed above.

148.    Plaintiff and Class members had sufficient direct dealings with Defendant's authorized retailers to establish privity of contract between Defendant, on the one hand, and Plaintiff and each Class member, on the other hand.

149.    Privity is not required because Plaintiff and each of the Class members are the intended third-party beneficiaries of Defendant's warranties and its sale through authorized retailers. The retailers were not intended to be the ultimate consumers of the Products and have no rights under the warranties provided by Defendant. Defendant's warranties were designed for and intended to benefit the consumer only and Plaintiff and Class members were the intended beneficiaries of the Products. In other words, the contracts are intended to benefit the ultimate consumer or user of the Products.

150.    Defendant's manifest intent that its warranties apply to Plaintiff and Class members as third-party beneficiaries is evident from the statements contained in its online "Warranty Policy," which states that it "applies only to single family use only for the original purchaser/gift recipient" and "covers purchases solely from an authorized retailer or distributor."

151.    Defendant was put on notice about its breach through consumer

warranty claims, its review of consumer complaints and other incident reports described herein, and on information and belief, through its own internal testing.

152.    Defendant cannot disclaim an express warranty made on product labeling and marketing.

153.    Defendant cannot disclaim its express warranty as it knowingly sold unsafe and hazardous Products.

154.    Plaintiff provided Defendant with reasonable notice of breach via letter and email on February 8, 2024.

155.    As a direct and proximate result of Defenant's breach of express warranty, Plaintiff and members of the Florida Subclass have been damaged in an amount to be proven at trial.

**Count IV**
**Violation of the Florida Unfair & Deceptive Trade Practices Act - Fla. Stat. §§ 501.201, et seq.**
**(On Behalf of Plaintiff and the Florida Subclass)**

156.    Plaintiff realleges and incorporates by reference all allegations raised in the paragraphs 1-105 as if fully stated herein.

157.    Plaintiff and Florida Subclass members are "consumers" as defined by Fla. Stat. § 501.203.

158.    Defendant advertised, offered, or sold goods or services in Florida and engaged in trade or commerce directly affecting the people of Florida.

159.    Defendant engaged in unconscionable, unfair, and deceptive acts

and practices in the conduct of trade and commerce, in violation of Fla. Stat. § 501.204(1).

160.    Defendant's omissions as alleged herein were material because they were likely to deceive reasonable consumers.

161.    Defendant knowingly and willfully concealed and suppressed material facts regarding the Products, namely, the existence of the latent safety defect and attendant risk of suffocation and death described above.

162.    Defendant's omissions of material facts were made to Plaintiff and the Classes each time they purchased the Products.

163.    Defendant knew that these omissions were material.  Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.

164.    Defendant intended that its omissions of material facts would induce Plaintiff and the Classes to purchase the Products.

165.    Plaintiff and the Classes reasonably relied on the omissions of material facts regarding the Products as described above.

166.    Plaintiff and the Classes would not have purchased, or at minimum would not have paid as much for Defendant's Products had they been accurately marketed, advertised, packaged, and sold.

167.    Plaintiff and the Classes did not know that their Products were

defectively designed, were incapable of maintaining a level and flat sleeping surface, and posed a risk of suffocation and death under normal use. Nor could Plaintiff and the Classes have discovered these concealed facts through reasonably diligent investigation.

168.    Plaintiff and Florida Subclass acted reasonably in relying on Defendant's omissions, the truth of which they could not have discovered.

169.    As a direct and proximate result of Defendant's deceptive acts and practices, Plaintiff and Florida Subclass have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Products.

170.    Plaintiff and Florida Subclass members seek all monetary and nonmonetary relief allowed by law, including actual or nominal damages under Fla. Stat. § 501.21; declaratory and injunctive relief; reasonable attorneys' fees and costs, under Fla. Stat. § 501.2105(1); and any other relief that is just and proper.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, individually and on behalf of the other members of the Classes, respectfully request that this Court:

A.    Certify the Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Name Plaintiff as Class Representative, and the undersigned counsel as Class Counsel;

C.    Declare that Defendant's failure to disclose the dangers of the Products constitutes unfair, deceptive, fraudulent, wrongful, and unlawful conduct;

D.    Grant restitution to Plaintiff and the Classes and require Defendant to disgorge their ill-gotten gains from Plaintiff and the Classes;

E.    Permanently enjoin Defendant from engaging in the wrongful conduct alleged herein;

F.    Issue a permanent injunction requiring Defendant to (i) recall all Products still in use; (ii) cease selling the Products as currently designed or stop labeling, marketing, and advertising them as safe or otherwise engaging in the deceptive omissions alleged herein; and (iii) add labeling to all future Products warning consumers of the dangers associated with their use;

G.    Order Defendant to pay compensatory damages, actual damages, exemplary damages, restitution, and statutory damages, as provided by applicable law, to Plaintiff and the other members of the Classes;

H.    Order Defendant to pay punitive damages, as allowable by law, to Plaintiff and other Members of the Classes;

I.    Award Plaintiff and the Classes their reasonable litigation expenses and costs of suit, including reasonable attorneys' fees to the extent provided by law;

J.    Award Plaintiff and the Classes pre- and post-judgment interest at the highest legal rate to the extent provided by law; and

K.    Award such further relief as the Court deems appropriate.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, on all claims in this Complaint so triable.

Dated:  February 16, 2024.

Respectfully submitted,

*/s/ J. Cameron Tribble*

Roy E. Barnes
Ga. Bar. No. 03900
J. Cameron Tribble
Georgia Bar No. 754759
**THE BARNES LAW GROUP, LLC**
31 Atlanta Street
Marietta, GA 30060
Telephone: 770-227-6375
Facsimile: 770-227-6373
roy@barneslawgroup.com
ctribble@barneslawgroup.com

Gary M. Klinger*
gklinger@milberg.com
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN**
227 W. Monroe Street, Suite 2100
Chicago, Illinois 60606
Tel: 866.252.0878

Alexander E. Wolf*
awolf@milberg.com
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN**
280 South Beverly Drive, Penthouse
Beverly Hills, California 90212
Tel: 872.365.7060

Kevin Laukaitis*
klaukaitis@laukaitislaw.com
**LAUKAITIS LAW LLC**
954 Avenida Ponce De Leon
Suite 205, #10518
San Juan, PR 00907
Tel: 215.789.4462

*Applications *pro hac vice* to be
submitted

***Attorneys for Plaintiff and the Classes***